UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| O.M. on behalf of herself and her minor child, L.P; | |
| Plaintiffs, | Civ. No. 23-4446 |
| -against- | COMPLAINT |
| NEW YORK CITY DEPARTMENT OF EDUCATION; THE BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK; CHANCELLOR DAVID BANKS in his official capacity; and THE CITY OF NEW YORK; | |
| Defendants. | |

## PRELIMINARY STATEMENT

1.      This Complaint is being filed on behalf of O.M.[1] alleging that Defendants, the New York City Department of Education, the Chancellor of the New York City Schools, in his Official Capacity, and the Board of Education of the City School District of the City of New York (collectively "DOE Defendants"), violated Plaintiffs' rights under the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400, *et seq*., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 701 ("Section 504"), the Americans with Disabilities Act of 1990 ("ADA"), 20 U.S.C. § 12101 *et seq*. ,  as well as New York State Education Law which is incorporated by reference into the IDEA.

2.      This complaint raises individual and systemic claims.

3.      L.P. is a 13-year-old student with a disability who lives in Staten Island, New York.

---

[1] Initials are used throughout this Complaint to preserve the confidentiality of sensitive medical, educational, and disability-related information under the IDEA and the Family Educational Rights and Privacy Act of 1974 (FERPA).

4.     L.P. has been diagnosed with Autism Spectrum Disorder ("ASD"), Cerebral Palsy, and an Intellectual Disability.

5.     Plaintiffs filed a due process complaint ("DPC") requesting an impartial due process hearing against the New York City Department of Education ("DOE") pursuant to the IDEA and Section 504, concerning L.P. and the 2022-2023 school year.  Defendants designated the case as Impartial Hearing Number ("IH No.") 228510.

6.     After hearings on the merits, the hearing officer issued a decision dated November 17, 2022 ("Decision"), finding that L.P. was denied a free, appropriate public education ("FAPE") for the 2022-2023 school year and awarding various relief, including tuition reimbursement, compensatory relief for missed pendency feeding therapy as well as delineating L.P.'s educational program for the remainder of the 2022-2023 school year to include extended school day, home-based Applied Behavioral Analysis ("ABA") services ("ESD Services").

7.     The DOE, however, filed a partial appeal to the New York State Review Officer ("SRO"), which was designated SRO No. 22-176.

8.     The DOE did not appeal the ruling that the DOE denied a FAPE to L.L.

9.     However, the DOE appealed the compensatory award, the order for a home-based program and the order to create an IEP for the 2022-2023 school year with the home-based services.

10.     The SRO issued a decision dated January 26, 2023. The SRO reversed and vacated the award of compensatory feeding therapy for missed pendency services and the orders for home-based services for the remainder of the 2022-2023 school year and for the DOE to create an IEP with the home-based services.

11.     Pursuant to the IDEA, Plaintiffs hereby appeal the SRO's decision.

12.     In addition, the Defendants have imposed a number of illegal policies and practices upon L.P. and her IEPs and/or have injured her as a result of the Defendants' failure to ensure that they have IDEA-compliant policies, procedures and practices.

13.     Defendants have discriminated against L.P. based upon her disability in violation of Section 504 and the ADA.

14.     In addition, throughout the course of the hearing and appeal, Defendants have failed to implement L.P.'s automatic "stay-put" pendency rights under 20 U.S.C. § 1415(j).

## PARTIES

15.     L.P. is a child with a disability pursuant to the IDEA and a qualified individual with a physical and mental impairment that substantially limits one or more major life activities under the meaning of Section 504 and the ADA.

16.     O.M. is L.P.'s mother.

17.     O.M. and L.P. and the rest of their family live together in Staten Island, New York.

18.     Defendant DAVID BANKS is the Chancellor of the New York City School District ("the Chancellor") and, as such, is entrusted with the specific powers and duties set forth in N.Y. EDUC. LAW §2590-h.

19.      Upon information and belief, THE NEW YORK CITY DEPARTMENT OF EDUCATION ("Department" or "DOE") is a local educational agency ("LEA") as defined in the IDEA, and thus bears the responsibilities of an LEA under the IDEA and in the New York State Education Law.

20.     Upon information and belief, the DOE is charged with the responsibility of developing policies with respect to the administration and operation of the public schools in the City of New York, including programs and services for students with disabilities.  N.Y. Educ. Law § 2590-g (McKinney 1980).

21.     Defendant THE BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK ("the Board of Education" or "the Board"), was or continues to be the official body charged with the responsibility of developing policies with respect to the administration and operation of the public schools in the City of New York.

22.     Defendant THE CITY OF NEW YORK is the municipality responsible for funding the DOE and issuing payments pursuant to IDEA hearings.

23.     All DOE Defendants jointly and/or individually constitute the LEA under the IDEA and state law.[2]

24.     All Defendants jointly and/or individually are recipients of federal financial assistance.

## JURISDICTION & VENUE

25.     This Court has jurisdiction over Plaintiffs' federal claims under the IDEA pursuant to 20 U.S.C. § 1415, 29 U.S.C. § 794, 42 U.S.C. § 1988, and as an action raising a federal question under 28 U.S.C. § 1331.

26.     This Court also has jurisdiction over Defendants and New York State law claims pursuant to 28 U.S.C. § 1367.

27.     Venue lies in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) as it is the judicial district in which Defendants are situated and/or reside.

## LEGAL FRAMEWORK – THE IDEA

28.     The IDEA guarantees that all eligible children with disabilities, ages three through twenty-one, must be offered a FAPE.  20 U.S.C. §1412(a)(1).

29.     A FAPE must meet a student's "unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. §1400(d)(1)(A)-(B).

---

[2] References to the DOE throughout the Complaint refer to the DOE singularly, as well as, in the alternative, refer to the DOE Defendants collectively.

35.     A FAPE must (a) be free, (b) "meet the standards of the State educational agency," (c) "include an appropriate . . . secondary school education in New York," and (d) be provided in conformity with an Individualized Education Program ("IEP"). 20 U.S.C. §§1401(9), 1414(d)(2)(A); 8 N.Y.C.R.R. §200.4(e)(1)(ii).

38.     A FAPE must also be provided in the Least Restrictive Environment ("LRE"), which is deemed to be an independent requirement of the IDEA.  20 U.S.C. §1412(a)(5).

39.     To be entitled to a FAPE, a child must have one or more of thirteen disabling conditions, including autism, and, by reason of his/her disability, require "special education" and "related services." 34 C.F.R. § 300.8(a)(1).

40.     The IDEA broadly defines the categories of services that must be offered to eligible children. Those services include, but are not limited to, special education, related services, supplementary aids and services, vocational training, transition services, assistive technology ("AT"), and positive behavioral supports and services (collectively "Special Education Services").

41.     New York State Law has created Committees on Special Education ("CSE"), which are responsible for school-age children with disabilities.  N.Y. Educ. Law § 4410; 8 N.Y.C.R.R. § 200.3(a)(1).

42.     Defendants are responsible for providing a FAPE to all eligible children in New York City and for promulgating policies and procedures in accordance with the IDEA.

43.     By the beginning of each school year, Defendants must have an IEP in place that offers a FAPE to each eligible child.  20 U.S.C. § 1414(d)(2).  An IEP, which must be individually tailored to each student, serves as a blueprint for each child's special education services.  20 U.S.C. § 1414(d).

44.     Before an IEP can be developed, a child must be evaluated in accordance with detailed procedures outlined in the IDEA, Section 504, and state law.  *See e.g.,*  20 U.S.C. §1414, 34 C.F.R. §§300.15, 300.303- 300.311. 8 N.Y.C.R.R. §200.4.  A child is reevaluated in accordance with the

same standards at least every three years, or earlier if a parent or school district believes it is necessary. *Id.*

45.    Among other things, an IEP must be developed by a properly constituted IEP team that includes particular members, including the parent and a district representative who is knowledgeable about the services and able to commit district resources.  20 U.S.C. § 1414(d)(1)(B).

46.    The IEP team must meet at least annually, and more frequently, if necessary, to modify a child's services and/or to address "[a] lack of expected progress toward the annual goals and in the general education curriculum."  20 U.S.C. §1414(d)(4)(A)(ii)(I).

47.    The IDEA prescribes, in detail, the process for developing IEPs and their contents.  20 U.S.C. §1414(d)(1)(A), (d)(2); 34 C.F.R. §§300.320(a)(2)-(3); 300.324; N.Y. Educ. Law §4401, *et seq.*; 8 N.Y.C.R.R. §200.4(d)(2)(iii).

48.    For example, all IEPs must contain the results of a child's most recent evaluations, as well as an accurate and consistent description of his/her strengths, present levels of academic achievement, and functional performance.  20 U.S.C.  §1414(d)(1)(A).

49.    An IEP must contain "a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modification or supports for school personnel that will be provided for the child."  20 U.S.C. § 1414(d)(1)(A)(i)(IV).

50.    Each IEP must also contain research-based instructional strategies - unless they are not feasible.  34  C.F.R.  §§300.320(a)(4),  300.324(a)(2)(i);  8  N.Y.C.R.R.  §§ 200.4(d)(2)(v)(b), 200.4(d)(3)(i).

51.    Every IEP team must consider whether a student would benefit from assistive technology ("AT").  34 C.F.R. §§ 300.5, 300.6, 300.105, 300.324(a)(2)(v).

52.    All decisions about a child's IEP and placement must be individualized and based upon the child's specific needs.

53.    The IDEA contains a set of due process rights, which includes Prior Written Notice of decisions made by the Defendants and distribution of Procedural Safeguards. 20 U.S.C. §1415. These notices and safeguards must be written in easily understandable language. 34 C.F.R § 300.503, 504.

54.    The IDEA also guarantees parents the right to file a due process complaint ("DPC") "with respect to any matter relating to the identification, evaluation, or educational placement of [a] child," or the provision of FAPE. 20 U.S.C. § 1415(b)(6)(A).

55.    Under the IDEA, when a parent files a DPC, the student is automatically entitled to continue in her "stay-put" educational program throughout the pendency of the proceedings. 20 U.S.C. § 1415(j).

56.    Once a DPC is filed, a parent "shall have an opportunity for an impartial due process hearing, which shall be conducted by the [SEA] or by the [LEA] as determined by State law or by the [SEA]." 20 U.S.C. §1415(f)(1)(A). In a two-tiered administrative system, like that of New York, "any party aggrieved by the findings and decision rendered [by the LEA] may appeal such findings and decision to the [SEA]." 20 U.S.C. §1415(g)(1). The SEA "shall conduct an impartial review of the findings and decision appealed." 20 U.S.C. §1415(g)(2).

57.    Defendants operate the first-tier due process hearing through the New York City Impartial Hearing Office, and are responsible for ensuring that impartial hearings comport with the IDEA's requirements.

58.    The SRO serves as the second-tier administrative review under the IDEA.

## FACTS

59.    A redacted copy of the DPC is attached hereto as Exhibit A. The allegations set forth in Exhibit A are incorporated herein by reference.

60.    A redacted copy of the Decision is attached hereto as Exhibit B.

61.    The DOE has classified L.B. under the IDEA with "Autism."  In addition, L.P. has been diagnosed with Cerebral Palsy and an intellectual disability.

62.    Due to her disabilities, L.P. exhibits significant delays across all domains – cognitive, academic, language, communication, motor, and activities of daily living ("ADL") and requires substantial support.

63.    L.P. also has serious feeding delays, including food aversions and difficulty tolerating certain food textures. L.P. requires all of her food to be well blended or mashed.

64.    Since she was in preschool back in the 2012-2023 or 2013-2014 school year ("SY"), L.P. has been attending a private school with a 6:1+3 ratio (6 students, 1 teacher, plus 3 teacher aides/paraprofessionals) that uses ABA in school.  Additionally, L.P. received speech-language therapy ("SLT"), occupational therapy ("OT"), and physical therapy ("PT") in school.

65.    For many years, L.P. has received after-school feeding therapy, three times per week for 60 minutes.  Initially, the DOE had placed feeding therapy on her IEPs (at least as early as 2017), but was not able to implement it because the DOE does not offer feeding therapy.  Later, L.P. was awarded feeding therapy through pendency, hearing decisions, or settlements after hearings were filed.

66.    The DOE has not offered L.P. a FAPE since at least 2019.

67.    O.M. filed a due process complaint ("DPC") concerning the 2020-2021 school year, which Defendants designated Case Number ("Case No.") 196444.

68.    In Case No. 196444, the hearing officer issued a decision dated March 3, 2021 ("2021 Decision"), finding that the DOE conceded it denied L.P. a FAPE for the 2020-2021 school year and ordering tuition payment and/or reimbursement for the private school, special education transportation, and "Feeding therapy at home 3x60," all on a 12-month ESY basis. A redacted version of the 2021 Decision is attached hereto as Exhibit C and incorporated herein by reference.

69.     The parent filed a new DPC for the 2021-2022 school year, and that case was ultimately settled, without impacting any stay-put rights that arose out of the 2021 Decision.

**2022-2023 School Year / IH Case No. 228150 / SRO No. 22-176**

70.     For the 2022-2023 school year, the DOE both failed to convene to create an IEP for L.P. and failed to offer any placement before the start of the school year.

71.     Yet again, the parent had to file a DPC seeking a hearing, or all of the funding for L.P.'s program and services would have terminated.

72.     On or about June 17, 2022, Plaintiffs, through counsel, sent the DOE a Ten-Day Notice indicating the parents' intent for L.P. to, *at a minimum*, continue at the private school with the various related services that were ordered by the 2021 Decision unless the DOE addressed the issues in the notice.

73.     The DOE failed to respond.

74.     Thereafter, on July 5, 2022, Plaintiff O.M. filed a DPC for the 2022-2023 school year, alleging, among other things, a denial of FAPE and claims under Section 504 and the ADA.

75.     Defendant DOE assigned the DPC Case No. 228150.

76.     Plaintiffs alleged in the DPC, *inter alia*, that for the 2022-2023 school year, Defendants failed to develop an IEP for L.P. and offer a placement to her.

77.     The DOE adopted a new policy and procedure for pendency for the 2022-2023 school year. For the 2022-2023 school year, the DOE decided that their lawyers would unilaterally fill out "forms" listing the DOE's view on a student's pendency.

78.     The DOE's lawyer unilaterally filled out a pendency form and dated it dated August 11, 2022 more than 30 days after the DPC was filed ("2022 Pendency Form").

79.      In the 2022 Pendency Form, the DOE allegedly agreed that L.P.'s pendency was based on the 2021 Decision and consisted of the following:

    a.      Private school placement;

    b.      At home feeding therapy 3x60 per week;

    c.      Special education transportation;

    d.      A twelve-month school year for all services.

80.     However, the 2022 Pendency Form, indicates that the feeding therapy is to be provided by a "private provider," even though the 2021 Decision directed the DOE deliver the feeding therapy. Further, as alleged herein, there was no testimony or evidence about what it meant that the DOE's lawyer unilaterally inserted "private provider" on the pendency form, since the DOE regularly uses private providers as contractors to fulfill IEP mandates, pendency mandates and hearing awards.

81.     At the administrative hearing, the DOE failed to present any case. The DOE did not call any witnesses or present evidence.

82.     However, at the hearing, the DOE argued that L.P.'s home-based services of feeding therapy and ABA were necessary for a FAPE, and, therefore L.P.'s placement at the private school was no longer appropriate.

83.     In the Decision, the hearing officer found that the DOE denied L.P. a FAPE for the 2022-2023 SY. *See* Exhibit B.

84.     Additionally, the Decision found that L.P.'s private school with home-based related services, including ABA, OT and feeding therapy, was appropriate.

85.     Among other things, the Decision ordered the DOE to pay and/or reimburse for L.P.'s private school and pay/reimburse/fund L.P.'s after-school services. Additionally, the Decision ordered the DOE to develop an IEP for L.P. that included the after-school services of ABA, OT and feeding therapy.

86.     At the hearing, O.M. also sought compensatory relief for the DOE's failure to implement L.P.'s pendency from July 5, 2022.

87.    The evidence established that the DOE failed to provide L.P.'s feeding therapy from July 5, 2022 to September 13, 2022. Accordingly, the IHO awarded a compensatory bank of 21 hours of feeding therapy.

88.    In a Request for Review ("RFR") dated December 27, 2022, the DOE appealed the Decision to the SRO, which was designated SRO No. 22-176.

89.    In its RFR, the DOE did not appeal the finding that L.P. was denied a FAPE and the award for tuition payment/reimbursement for the private school. To the extent that the IHO made rulings favorable to the Plaintiffs which were not appealed, those rulings have become final and binding, including the finding that L.P. was denied a FAPE for the 2022-2023 school year and the award for tuition reimbursement and special education transportation.

90.    The DOE appealed the IHO's findings that the home-based services were appropriate and the award for their funding, arguing that they were not part of L.P.'s "unilateral placement," and therefore could not be awarded.

91.    However, the DOE waived this argument at the hearing below and, as alleged above, was wholly contradictory to the argument that the DOE made at the hearing – acknowledging that L.P.'s home-based services are necessary components of her educational program.

92.    It is blackletter law that an agency attorney cannot take contrary positions in the same case.

93.    Further, the DOE erroneously argued that the home-based services were solely to be used to "generalize" and "maximize" L.P.'s skills and therefore were not necessary. Again, this argument was not raised below and, in fact, the DOE's lawyer made the opposite argument at the hearing.  Again, the SRO should have deemed this argument to have been waived.

94.    Additionally, the DOE argued that the IHO erroneously awarded compensatory relief for L.P.'s missed pendency, arguing "it was the Parent, and not the DOE [who was] responsible for

the implementation" of the student's pendency, and specifically the feeding therapy.  therapy, citing

its own pendency form as the basis for the "parent's responsibility."

95.    However, the DOE never raised this defense at the hearing and that argument should

have been deemed waived by the SRO.

96.    Further, this position was contrary to the law and the record for several reasons:

   a.    The DOE unilaterally created and signed the pendency form without a co-

   signature from the parent or her counsel;

   b.    The DOE changed the pendency procedures without notice to the parents or

   parent's bar about the meaning of the pendency form and the new policies and/or

   obtaining appropriate approvals;

   c.    The DOE changed its policies on pendency and compensatory pendency in

   2022 without notice to the parents and/or without a notice and comment period;

   d.    The DOE contracts with and uses private providers regularly for

   implementing IEPs, hearings and pendency; the form did not state that the private

   provider had to be selected by the Parent and that it was O.M.'s obligation to find the

   provider.

   e.    The notation that the feeding therapy was to be provided by a "private

   provider" was erroneous as the 2021 Decision directed the DOE to provide feeding

   therapy.

   f.    The Second Circuit case law is clear that the DOE is responsible for

   implementing a student's pendency.

   g.    The DOE has never been able to implement feeding therapy, as the DOE

   illegally refuses to offer it directly, and has historically and directly used private

   providers to implement it when such therapy was ordered or recommended. Thus, the

parent and her counsel would not have had notice from the notation of "private

provider" on the DOE's form that the burden of pendency would be placed on the

parent.

97.     Finally, the DOE argued on appeal that the IHO's order for the DOE to create an IEP

that included the after-school related services was error, which it was not, given that this issue is both

(a) capable of repetition and yet evading review; and (b) the services that the parent sought cannot be

placed on any IEP by any IEP team.

98.     On January 3, 2023, O.M. submitted her verified Answer to DOE's appeal.

99.     In a decision dated January 26, 2023 ("SRO Decision"), the SRO reversed multiple

aspects of the IHO's award, including issues that were not before the SRO.

100.     First, the SRO vacated the student's long-standing feeding therapy mandate,

unilaterally eliminating it from L.P.'s program.

101.     The SRO's ruling removing the feeding therapy from L.P.'s program was incorrect as

a matter of law and based on the record for a variety of reasons including:

    a.     The DOE did not raise this issue at the hearing and, in fact, argued at the

hearing that the feeding therapy was necessary for a FAPE.

    b.     The DOE waived this argument at the hearing.

    c.      The parent presented significant evidence that feeding therapy needed to be

continued as part of the student's program; the DOE did not offer any evidence to

rebut the parent's evidence and even declined to cross-examine the student's feeding

therapist.

    d.     The SRO had no evidence or legal basis for vacating the student's long-

standing feeding therapy, particularly without any reevaluation as to whether that

service continued to be needed.

e.       The issue of whether feeding therapy should continue to be part of the

program should not have been appealable as it was part of the student's last agreed

upon program, and since the DOE did not offer any IEP or program the DOE was

estopped from challenging the last agreed upon program and placement at the

hearing.  The DOE did not challenge the appropriateness of feeding therapy.

102.    Further, the SRO reversed the IHO's order of compensatory feeding therapy, finding,

erroneously, that it was the parent's obligation to implement her child's own stay-put services, and

relying on the 2022 Pendency Form rather than the actual, underlying 2021 Decision of the IHO.

103.    The SRO's ruling reversing the compensatory feeding therapy was incorrect as a matter

of law and based on the record for a variety of reasons including:

a.       The DOE did not raise this argument at the hearing and, in fact, asserted that

compensatory pendency should be addressed in federal court and/or another hearing.

b.       There was no record below about the meaning of the form, the procedures for

pendency, the meaning of the phrase "private provider" and no information that the

SRO could have relied on to determine that "private provider" meant that it was

O.M.'s obligation to staff the pendency.

c.       The SRO was on notice and ignored the fact that the DOE regularly uses

private providers to implement student's services.  The SRO knows this because there

are scores of SRO decisions pursuant to which the SRO has held that the DOE's

issuance of a voucher called an "RSA" for a private provider does not satisfy

pendency.

d.       The SRO's decision here was inconsistent with multiple other SRO decisions

issued by the SRO concerning both compensatory pendency and use of private

providers by the DOE.

14

e.     The SRO's decision here was contrary to case law in the Second Circuit and the IDEA itself.

104.    The SRO reversed the IHO's finding that L.P. also required ABA and OT services as part of an extended school day ("ESD").   In vacating that part of the IHO's order, the SRO committed multiple errors of law and the record.  Among other things:

a.     The DOE did not raise this issue at the hearing and, in fact, argued at the hearing that the services were necessary for a FAPE.

b.     The DOE waived this argument at the hearing.

c.      The parent presented significant evidence that ABA and OT should be provided to the Student; the DOE did not offer any evidence to rebut the parent's evidence supporting L.P.'s need for ABA and OT.

d.     The IHO was well within her authority to order the DOE to add services to the IEP, particularly since the DOE does not offer ABA or ESD services and thus, the only way for a child to receive them would be to litigate.

e.     The SRO adopted a discriminatory standard for refusing to award the ESD services, focused on generalization.

f.     The SRO had no evidence for vacating this part of the Decision.

105.    The SRO's Decision has grave implications for families who cannot afford to pay for an entire program as part of a self-help remedy, but yet need such a program for their child to receive a FAPE.

106.    There are scores of cases where wealthy families were able to pay for an in-school and after-school program and seek reimbursement.  However, based on the SRO's Decision, it would be impossible for any parent whose child had a private school program as pendency to obtain additional relief and still obtain tuition payment for their child's underlying program.

107.    Overall, the SRO made numerous erroneous findings and rulings that are contrary to the law, including but not limited to:

      a.      Finding that the DOE was not required to provide L.P.'s feeding therapy;

      b.      Finding that "the parent elected to carry the responsibility for ensuring the delivery of the stay-put services, with the district remaining responsible only for funding the services so delivered" and the parent "assumed the risk" and consequences of any difficulty in finding a provider;

      c.      Reversing and vacating the compensatory feeding therapy for L.P.'s missed pendency services;

      d.      Finding that L.P.'s home-based program and request for funding for these services during the 2022-2023 school year is subject to a "unilateral placement" analysis, including a requirement that a parent undertake a financial risk for these services;

      e.      Finding that the evidence did not establish that O.M. required ESD services of feeding therapy, ABA and OT;

      f.      Finding that L.P.'s home-based program was for the purpose of generalizing skills only;

      g.      Refusing to consider generalization of skills -- i.e. learning -- to be a required aspect of public education to which students with disabilities must have access, as it is the entire function of the public education system for typically developing students;

      h.      Reversing and vacating the IHO's order in the Decision that L.P. should receive the home-based program for the 2022-2023 SY; and

      i.      Reversing and vacating the IHO's order that the DOE add the home-based program to an IEP for L.P.

108.    Further, the SRO left the status of the student's stay-put placement ambiguous relative to the issues of feeding therapy. The SRO erroneously took jurisdiction over the question of whether the home-based program was appropriate, despite the fact that the DOE never offered a new IEP or placement for the entire school year and home-based feeding therapy was part of L.P.'s stay-put placement.

109.    All rulings of the SRO that were adverse to Plaintiffs are being appealed here, even if they are not specifically listed.

110.    As to all adverse rulings, the SRO's decision was an abuse of discretion, erroneous as a matter of law, and in conflict with the record.

111.    The SRO lacked any jurisdiction to hear Plaintiffs' 504 and ADA claims and thus, those claims should be litigated *de novo* in Court.

**Plaintiffs are Entitled to Compensatory Education for Pendency Violations**

112.    From the date that the DPC was filed and up and throughout the pendency of these proceedings, L.P. was and remains entitled to continue in her stay-put pendency placement.

113.    Defendants failed to implement all aspects of L.P.'s pendency.  As discussed in this complaint, Defendants do not employ staff to provide all of L.P.'s pendency services and in particular feeding therapy, and instead foist the responsibility of implementing pendency on parents by forcing them to locate their own private providers.

114.    Moreover, parents should not be obligated to "assume the risk" in finding private providers for services that the DOE does not and cannot offer itself.

115.    Additionally, the prior order in Case No. 196444 in which L.P.'s pendency is based does not include the proviso that the feeding therapy should be provided by private providers.  Thus, the DOE's pendency form was wrong to include this limitation on its pendency form.

116.    Plaintiffs are entitled to compensatory education and additional equitable relief based on the Defendants' failure to implement the pendency throughout the 2022-2023 school year, from the date of the filing of the DPC.

117.    Further, DOE will continue to be unable to implement L.P.'s pendency placement.

118.    Further, Defendants failed, and continue to fail, to timely authorize and pay private providers that are implementing pendency, jeopardizing and risking the ability of those providers to start timely and/or to continue to deliver the services.

119.    No exhaustion is required for pendency violations.

120.    For all these reasons, and more, the SRO was wrong to fault the parent for the missed pendency feeding therapy and the Court should reinstate the Decision's compensatory award of 21 hours of feeding therapy for the DOE's pendency violations, as well as award additional compensatory relief for all time periods during the 2022-2023 school year, and throughout this case, when the DOE failed to provide feeding therapy and L.P. did not fully receive this mandate, or was forced to use a compensatory award to fund this service.

**Defendants Practice of Terminating Funding for Student's Last Agreed upon Services Even When They Fail to Offer an IEP or Placement Violates the IDEA**

121.    In this case, Plaintiffs had a prior hearing decision establishing services that were part of pendency.

122.    Defendants regularly fail to issue IEPs by the beginning of the school year to students like L.P., students who attend private schools pursuant to prior favorable decisions by hearing officers.

123.    Yet, as in this case, under Defendants' policies, they terminated the funding for the last agreed-upon placement that the student had, forcing the parents to retain counsel and file yet another hearing to continue a student's pendency program.

124.    Then, in the hearing, after the parents were forced into litigation, the Defendants do not defend their actions and yet, these actions result in the loss of special education services that are, in any event, part of the student's stay-put placement.

125.    Defendants have consistently predetermined L.P.'s IEPs or terminated funding for her services, which, as a result, causes Plaintiffs to engage in a constant state of litigation to maintain his program.

**Defendants Offer a Limited Menu of Services and Apply Institutionalized Predetermination**

126.    Defendants offer a "few-sizes-fits-most" approach to special education.

127.    IEP teams are not generally allowed to offer 1:1 instruction, ABA, after-school services, home-based special education or related services.

128.    Defendants have consistently predetermined L.P.'s IEPs or terminated funding for her services, which, as a result, causes Plaintiffs to engage in a constant state of litigation to maintain her program.

129.    Defendants will not recommend the services that constitute L.P. needs for a FAPE – namely, ABA, 1:1 instruction, home-based services.

130.    Defendants do not employ staff that are available to deliver the programs and services that constitute L.P.'s FAPE and in particular, ABA and home-based services.

131.    Defendants have not ensured that their menu of service options for children with autism includes 1:1 instruction, ABA and home-based services that are part of L.P.'s FAPE.

132.    The only way for the Plaintiffs to maintain L.P.'s FAPE, including 1:1 instruction using the principles of ABA and home-based services, is to engage in litigation.

133.    The DOE is not permitted to recommend ABA and after-school special education services for children with autism.

134.    O.M. and L.P. have been subject to these policies and practices for several years. These policies and practices violate the IDEA and Section 504.

135.    There is no remedy through the administrative process to address the systemic claims raised here, as IHOs do not have authority to order the Defendants to refrain from applying policies and practices to Plaintiffs.

136.    The DOE does not offer a school program with 1:1 instruction using the principles of ABA, feeding therapy, and home-based services generally.

137.    Further, the DOE has failed to ensure that there are enough ABA schools in New York City to meet the needs of children who need school settings with ABA instruction and/or 1:1 instruction.

**Defendants Do Not Have Feeding Therapy or Services to Address Feeding**

138.    Feeding Therapy is a related service that should be offered to eligible school-age children under the IDEA if those services are required for a FAPE.

139.    Other school districts in New York offer feeding therapy.

140.    Defendants operate a limited menu of services for children with IEPs that does not include feeding therapy.

141.    Every parent of any child who needs an off-menu service, like feeding therapy, must file for due process in order to obtain feeding therapy.

**Defendants have Subjected Plaintiffs to Systemic Practices Concerning Pendency**

142.    Defendants have failed to implement policies, procedures, or resources to ensure timely implementation of pendency for children with IEPs whose parents file DPCs in New York City.

143.    While the problems with implementation of pendency worsened due to the COVID-19 Pandemic, the Defendants' failures in this regard long-predated the Pandemic.

144.    Although pendency rights are supposed to be automatic, under Defendants' policies, procedures and practices, Defendants do not implement a student's pendency placement upon the filing of a DPC.

145.    Until the 2019-2020 school year, Defendants refused to implement pendency unless an impartial hearing officer ("IHO") issued a "pendency order," even when the substance of a student's pendency placement was not in dispute.

146.    A pendency order is a written interim order issued by a hearing officer which directs Defendants to provide and/or fund the pendency services that a child is supposed to receive.

147.    In May 2019, the New York State Education Department ("NYSED") issued the New York City Department of Education Compliance Assurance Plan ("Compliance Plan") to

148.    In the Compliance Plan, NYSED found Defendants out of compliance with its obligation to ensure a functioning due process system.  State Defendants found that it was improper for Defendants to require hearings and decisions for pendency "even when a student's pendency is not in dispute, unnecessarily adding to the number of due process complaints filed."

149.    To address pendency for the 2020-2021 school year, the Defendants changed their policies and procedures.

150.    Pursuant to the new procedures issued at the start of the 2020-2021 school year, uncontested pendency services cannot be implemented until such time as the parent (or parent representatives) and the Defendants, DOE, execute a "Pendency Agreement."  This policy did not apply to any pending hearings which already had a pendency order in place.

151.    Defendants conditioned implementation of uncontested pendency upon the parent or his or her representative filling out a "Pendency Agreement Form" which lists the services and the basis for pendency.

152.    In or about the start of the 2022-2023 school year, Defendants changed their pendency forms.

153.    Rather than a co-signed agreement, the new form contemplates that the DOE's lawyers will unilaterally fill out, and process a "Pendency Document" without agreement by the parent or parent's counsel, when the DOE's lawyers decide that pendency is "uncontested."

154.    Further, upon information and belief, the DOE has secret procedures and instructions for their staff concerning pendency implementation and pendency documents, which the DOE never made public or shared with parents or their counsel.

155.    Apparently, one of these secret procedures includes that when the DOE's lawyers write "private provider" on a unilaterally signed pendency form (such as the one in this case), the DOE's lawyers mean that it is the parent's obligation to implement pendency and the parent waives all rights to compensatory education for any failure to implement pendency.

156.    Further, there is a systemic delay in the time between when a DPC is filed by emailing the DPC to the designated address to the date on which the DOE's lawyers execute the Pendency Document.

157.    Moreover, after the DOE's lawyers unilaterally execute the Pendency Document, they send it to the DOE's Impartial Hearing Implementation Unit" ("IHIU").

158.    Until the IHIU was made responsible for implementing Pendency Agreement Forms disguised as "decisions," the IHIU's sole responsibilities were to implement impartial hearing orders issued by impartial hearing officers.

159.    The IHIU is the subject of a long-standing class action due to the DOE's failures to timely implement interim, pendency and orders of IHOs. *L.V. v. New York City Department of Education*,

160.    Once the DOE started to use the Pendency Documents, they still use the IHIU for purposes of implementing these Pendency Documents, despite the fact that the Pendency Documents are not orders.

161.    Defendants have historically failed to ensure that the IHIU has the sufficient staff to handle the volume of complaints, and there are delays, ranging from days, weeks and even more than one month, before DPCs are processed and assigned a case number.

162.    The IHIU has historically been significantly understaffed and not provided adequate funding and resources prior to the Pandemic to implement the growing number of orders.    The Pandemic has not helped this situation.

163.    The IHIU has not made the procedures for processing the Pendency Agreements public and thus it is not clear what is involved.

164.    According to what appear to be unwritten procedures, the IHIU's obligation to implement the Pendency Agreement Form is not triggered until such time as the form is "processed," uploaded into the IHIU system and issued as a "decision."

165.    With respect to pendency, the DOE will either (a) reimburse a parent; (b) directly pay a provider; (c) directly provide the services with a private provider/contract provider.

166.    The IHIU's primary function appears to be approving and processing payments for private providers.

**Defendants Often Use Private Providers**

167.    Defendants rely heavily on private, independent providers to implement pendency for children whose parents file hearings.

168.    Defendants have their own system of private providers which they fund both through Contract Agencies, as well as through vouchers, called Related Service Authorizations ("RSAs") or P-4s (for SETSS services). The DOE also uses AA-2 vouchers for private evaluations.

169.    The DOE's Standard Operating Procedures Manual for Special Education provides that contract agencies – i.e. "private providers" – are used for both assessments and fulfilling IEP mandates. If a "contract agency" is not available, the DOE will issue an RSA or P-4.

170.    In addition, historically, under the L.V. Class Action, if the DOE is ordered to provide a service that is in a shortage area or if the order is impossible to implement, the DOE may arrange for an alternative service.

171.    Historically, and until the DOE changes the policy and procedure unilaterally in approximately 2022, the DOE would agree to authorize a direct payment to a private provider when the DOE could not implement the order.

172.    Historically, in a case such as this one, where the DOE did not offer the service or there is a shortage area or problem with implementation, the DOE would agree to pay the provider directly, and would never oppose compensatory education for failure to implement pendency when there were gaps in services.

173.    Thus, parents and their counsel had no reason to presume that in a situation such as the one at bar, the parent would waive compensatory education by finding a provider when the DOE was unable to implement an order or a pendency obligation that it had.

174.    In general, practically, parents such as O.M. ended up responsible for trying to implement their own pendency by locating providers, taking on debts or leave their children without services until this process resolves based on a lack of resources.

175.    However, until the DOE changed its practices recently, parents who try to accept alternative relief *in lieu* of the DOE's failure to implement services did not have notice that they were going to waive their child's right to compensatory pendency for the gaps in the services, particularly when, as here, the DOE does not offer feeding therapy and that service is a shortage area.

176.    While some private providers of pendency services will agree to implement services before the above process unfolds, many providers will not agree to do so and require the pendency order and approval from the IHIU, or a voucher from the DOE before commencing services.  Some providers and schools will not allow student to start or enroll and/or continue enrollment unless the funds are paid in advance or on a timely basis.

177.    The delays in this process leaves families who cannot afford to pay for pendency and/or for whom funding pendency is a hardship in an untenable situation.

178.    Further, due to the DOE's extensive payment delays, it is difficult to find a private provider to plug the gap in services, when a parent has a Pendency Document.

179.    Before a private provider is funded directly through IHIU, the Parent must contact the IHIU and request an authorization, providing, among other things, a specific list of the providers tax information, rates, number of hours.

180.    The IHIU will review the information, and, at some point, issue an "approval" to the provider by email, after which time the provider can directly bill the DOE through the IHIU using specific forms required by DOE.

181.    Even when the above procedures have been followed, when providers submit invoices for payment for services rendered, IHIU has extensive, months-long delays in processing the invoices and issuing payment to providers.  This delay in payment often causes providers to terminate services.

182.    Further, the IHIU will never pay in advance for services. Private services and tuition are paid, only upon submission of proof that the services were received.

183.    With respect to payment to private providers, the IHIU can either authorize direct payments to providers (as described above) or they can facilitate the issuance of vouchers, as noted previously, RSAs or P-4 forms.

184.    While some providers accept vouchers, many providers have determined that they will no longer accept vouchers due to payment delays and the fact that the voucher rates have not been increased for more than twenty years and are substantially below market rates.

185.    Further, while many parents will agree to accept vouchers, the DOE's issuance of vouchers alone does not fulfill its obligation for implementing pendency.

186.    The DOE is fully aware of their failure to implement pendency through the IHIU and yet has adopted the policy and practice of trying to lure families into thinking that the pendency issues will be resolved, and then turns around and asserts – as here – that compensatory pendency is not warranted.

187.    In fact, in the L.V. Class Action, a Special Master appointed by the Court just submitted a far-reaching report documenting myriad failure by the IHIU to implement services for families.

**The DOE Systemically Fails to Timely Implement Pendency and Then Tries to Benefit from Their Own Malfeasance by Preventing Families Who Use Private Providers from Receiving Compensatory Education for Their Children**

188.    Systemically, due to the general administrative failures of the DOE, as well as the delays in the IHIU, Defendants systemically fail to implement pendency, whether it's direct provision of services or satisfaction of the Parent's debt.

189.    Over the past year, Defendants have determined that they will seek to benefit from their own malfeasance and prevent children who have orders and/or who are entitled to pendency from receiving make-up services when there is a gap in the services.

190.    However, if these children were served by the DOE in the first instance, had been offered a FAPE in a public school, or if the DOE took responsibility for fulfilling orders and pendency for services like feeding therapy and/or ABA, there would be no question that the DOE would be responsible for implementing make-up services.

191.    To prevent children from receiving compensatory pendency services in this situation, like L.P., subjects L.P. to discrimination based on his disability.

**Further Exhaustion of Claims is Not Required**

192.    Plaintiffs are not required to further exhaust their claims for compensatory education based on pendency.

193.    Plaintiffs are not required to further exhaust their systemic claims and have fully exhausted claims based on the appeal of the SRO decision.

194.    Plaintiffs are unable to exhaust any other claims due to the lack of a mechanism for exhaustion and IHO shortages.

## CLAIMS

FIRST CLAIM
SECTION 504 OF THE REHABILITATION ACT

195.    Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein.

196.    Defendants' conduct is knowing, intentional, reckless, and gross.

197.    L.P. is a qualified individual with a disability entitled to protection under Section 504.

198.    Defendants discriminated against L.P. under Section 504 by, *inter alia*, denying her reasonable accommodations, adopting systemic policies, procedures and practices that violate L.P.'s rights under the IDEA and New York State law, and engaging in widespread and pervasive violations of the IDEA and New York State Education law.

199.    Defendants discriminated against L.P. under Section 504 by, *inter alia*, committing extensive, repeated, gross, knowing and reckless violations of multiple provisions of the IDEA.

200.    Defendants discriminated against L.P. (and will continue to discriminate against him), by engaging in systemic pre-tedermination and offering only a limited menu of options that

exclude recommendations on an IEP of ABA, extended school day services on an IEP, and feeding therapy.

201.    Defendants discriminated against L.P. (and will continue to discriminate against him), by systemically failing to implement pendency rights.

202.    Defendants also discriminated against L.P. under Section 504 by repeatedly failing to implement pendency and final orders and repeatedly failing to offer L.P. a FAPE for several school years.

203.    In addition, by adopting a policy and practice of opposing compensatory education for L.P., the Defendants are subjecting him to discrimination based on his disability.

204.    But for the fact that he was denied a FAPE and his parent had to invoke pendency to keep his pending funding in place for the private school, had L.P. been provided a FAPE he would have been entitled to compensatory education.

205.    But for the fact that the DOE illegally refuses to offer feeding therapy to children who are entitled to it *via* orders and/or stay-put, there would be no doubt that L.P. would be entitled to compensatory education. Thus, the DOE's policy and practice of refusing to directly offer those services and implement pendency, is discriminatory.

SECOND CLAIM<br>THE IDEA

206.    Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein.

207.    Defendants did not offer L.P. a FAPE for the school year alleged herein.

208.    Plaintiffs have exhausted the administrative procedures the school year alleged herein, as required by the IDEA.

28

209.    Defendants' application of blanket policies and practices repeatedly deny L.P. a FAPE and violates the IDEA.

210.    Defendants have repeatedly failed, and are currently failing, to implement L.P.'s stay-put rights under the IDEA.

211.    Defendants have failed to implement fully the decisions for the school years at issue.

212.    Defendants have repeatedly failed to comply with the IDEA's procedural requirements.

213.    Defendants engaged in systemic predetermination by refusing to individualize IEPs for L.P. and to offer services that should be available under the IDEA.

214.    Defendants denied L.P. her due process rights under the IDEA.

215.    With this complaint, Plaintiffs seek re-instatement and implementation of L.P.'s pendency program, including the private school placement with transportation and the provision of L.P.'s feeding therapy by the DOE.

216.    Plaintiffs also seek compensatory relief for all of the DOE's violations of L.P.'s pendency, including causing Plaintiffs to use a prior compensatory bank of feeding therapy to ensure continuity of this necessary service for L.P.

THIRD CLAIM
42 U.S.C. § 1983

217.    Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein.

218.    Defendants have violated 42 U.S.C. §1983 by depriving Plaintiffs, under color of state law, of their rights, privileges, and immunities under federal statutory and constitutional law.

219.    By implementing, promulgating, and continuing to enforce and/or effectuate policies, practices, and customs as alleged herein, Defendants have denied L.P. the educational services to which she is entitled under the IDEA and New York law, in violation of 42 U.S.C. § 1983.

220.    By failing to supervise and train their employees and agents concerning the federal and state laws and policies concerning general and special education services, Defendants have violated 42 U.S.C. § 1983.

221.    By failing to ensure that pendency and decisions were implemented, Defendants violated 42 U.S.C. §1983.

222.    The Defendants violated Plaintiffs' rights under 42 U.S.C. § 1983 by failing to have adequate policies, procedures, protocols, and training to ensure that the provisions of the IDEA and Section 504 referenced herein were complied with, which deprived L.P. of her right to a free and appropriate education under federal and state law.

223.    Under color of state law, the Defendants deprived L.P. of her right to educational services afforded to her under New York State law, in violation of the Fourteenth Amendment of the U.S. Constitution.

224.    As a direct and proximate result of the Defendants' misconduct, L.P. has suffered and will continue to suffer harm, unless Defendants are enjoined from their unlawful conduct.

FOURTH CLAIM
THE ADA

225.    Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein.

226.    The ADA, like Section 504, prohibits discrimination based on disability.

227.    L.P. is a qualified individual with a disability entitled to protection under the ADA.

228.    Defendants discriminated against L.P. because of her autism by, *inter alia*, denying her reasonable accommodations, adopting systemic policies, procedures and practices that violate L.P.'s rights under the IDEA and New York State law, including the failure to offer, recommend, and provide feeding therapy, ABA and home-based services, and engaging in widespread and pervasive violations of the IDEA and New York State Education law.

229.     Defendants discriminated against L.P. by, *inter alia*, committing extensive, repeated, gross, knowing and reckless violations of multiple provisions of the IDEA and New York State law. Defendants also discriminated against L.P. by repeatedly failing to implement pendency and final orders and repeatedly failing to offer L.P. a FAPE for several school years.

230.     Defendants' actions (and inactions) discriminated against L.P. on the basis of her autism when it failed to make individualized determinations of her needs and recommendations.

231.     As a result of Defendants' actions, L.P. has suffered, and will continue to suffer, harm.

FIFTH CLAIM<br>NY STATE EDUCATION LAW

232.     Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein.

233.     Defendants have violated L.P.'s rights and deprived her of educational services to which she was entitled pursuant to the New York State Constitution, New York State Education Law, and the Regulations of the New York State Commissioner, 8 N.Y.C.R.R. § 200 *et seq*.

234.     The special education provisions of the New York State Education Law and regulations are incorporated by reference into the IDEA and enforceable as such.

**RELIEF**

235.     Wherefore, Plaintiffs request that the Court:

a.     Issue a TRO and preliminary injunction ordering Defendants to implement L.P.'s pendency services forthwith, retroactively to the date of the SRO Decision, including placement at the private school, transportation, and feeding therapy 3x60 per week.

b.     Issue a Declaratory Judgment in Plaintiffs' favor finding that Defendants violated Plaintiffs' rights as alleged herein under the IDEA, Section 504 and Section 1983;

c.     Issue a final Order and Judgment in Plaintiffs' favor that includes:

i.      Equitable relief and additional compensatory education for the
        Defendants' failure to implement pendency;

ii.     Equitable relief and compensatory education, including reinstatement of
        the Decision's award of 21 hours of compensatory feeding therapy, plus
        additional compensatory relief, for the Defendants' violation of the IDEA
        for the 2022-2023 school year;

iii.    Equitable relief and additional compensatory education to place L.P. in the
        position that she would have been in had she not suffered the FAPE
        deprivations alleged herein under the IDEA and Section 504;

iv.     Equitable, injunctive and other relief for Defendants' violations of the
        ADA;

v.      Establishment of a compensatory education trust, if necessary, for
        purposes of funding the compensatory education services; and

vi.     Awarding Plaintiffs costs and attorneys' fees for this action and the
        underlying administrative hearings; and

vii.    Ordering such other relief as may be appropriate.

Dated:  May 26, 2023
        New York, New York

                                        Respectfully submitted,
                                        THE LAW OFFICE OF ELISA HYMAN, P.C.

                                            /s  Erin O'Connor
                                        By_____
                                        Erin O'Connor, Esq., Of Counsel
                                        Attorney for the Plaintiffs
                                        1115 Broadway, 12th Floor
                                        New York, NY 10010
                                        646-572-9075
                                        eoconnor@specialedlawyer.com